# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. ALEXIS MASON and TERRENCE HARRIS

**Appeal from the Criminal Court for Shelby County**
**No. 09-04389     Lee V. Coffee, Judge**

---

**No. W2010-02321-CCA-R3-CD  - Filed March 27, 2013**

---

In a joint trial, the Appellants, Alexis Mason and Terrence Harris, were convicted of various offenses by a Shelby County jury.  Appellant Mason was found guilty of one count of second degree murder, a Class A felony, and three counts of aggravated assault, a Class C felony, for which she received an effective sentence of thirty-seven years in the Department of Correction.  Appellant Harris was convicted of three counts of facilitation of aggravated assault, a Class D felony, and one count of facilitation of criminally negligent homicide, a Class A misdemeanor, for which he received an effective sentence of twelve years, eleven months, and twenty-nine days in the Department of Correction.  In this consolidated appeal, both Appellants challenge the sufficiency of the evidence supporting their convictions and the sentences imposed by the trial court.  Appellant Harris additionally argues that the trial court erred in the following evidentiary rulings: admission of various out-of-court statements; admission of an autopsy photograph; exclusion of evidence of the deceased victim's violent character; and the denial of jury instructions on self-defense and lesser included offenses.  Finding no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., joined. JOHN EVERETT WILLIAMS, J., concurring in results only.

James E. Thomas (on appeal) and Michael G. Floyd (at trial), Memphis, Tennessee, for the Defendant-Appellant, Alexis Mason.

Blake D. Ballin, Memphis, Tennessee, for the Defendant-Appellant, Terrence Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel, Assistant Attorney General; Amy P. Weirich, District Attorney General; Glen C. Baity and Kate Edmands, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

Over a period of two days, Appellant Mason and the victims, Laketra Campbell, Sabrina Campbell, Sherika Swift, and Shamika Farris, were involved in a verbal dispute, stemming from one car "bumping" another car while backing out of a driveway. This dispute eventually led to Appellant Mason shooting and killing Sabrina Campbell, one of the victims in this case. It began on March 20, 2009, when Sherika Swift was attempting to back out of a driveway and bumped into the car in which Appellant Mason was a passenger. Swift got out of the car and approached the other car. An argument ensued, and Appellant Mason got out of her car and kicked Swift's car, denting it. Later that same day, Laketra Campbell, the owner of Swift's car, attempted to contact Appellant Mason by phone to ascertain why Appellant Mason dented her car. In response, Appellant Mason "cussed" Laketra Campbell. The next day, March 21, 2009, the dispute escalated into a physical confrontation between the victims and Appellant Mason, during which Sabrina Campbell took a metal broomstick away from Appellant Mason, and struck her with it. Later that afternoon, Appellant Harris, with Appellant Mason as the front seat passenger, pursued the victims in an SUV, forcing the victim's car into another car. Appellant Mason then fired several shots at the four women out the window of the SUV driven by Appellant Harris. One of the bullets struck and killed Sabrina Campbell. Appellant Mason was subsequently indicted for one count of first degree premeditated murder and three counts of aggravated assault. Appellant Harris was indicted for one count of facilitation of first degree murder and three counts of facilitation of aggravated assault. The following proof was adduced at trial.

Laketra Campbell testified that the last time she saw her sister, Sabrina, alive was on March 21, 2009.[1] Laketra stated that on March 20, 2009, she loaned her car to her friend, Sherika Swift, and her sister. When her sister and Swift returned home with Laketra's car, it had a dent in it. Laketra later learned that Appellant Mason was responsible for the dent in her car. That same day, Laketra called Appellant Mason to inquire "what happened," and Appellant Mason "[went] off and start[ed] cussing," so Campbell hung up the phone.

The next day, March 21, 2009, Laketra called Appellant Mason and told her that she was on her way to her house. Laketra, Sabrina, Swift, and Farris drove to the home of Swift's boyfriend, Rernardo Wilson, and dropped off their children. On her way to Appellant Mason's house, Laketra saw Appellant Mason and Derwin Owens. When Laketra asked Appellant Mason, "Why is this dent in my car," she said that Appellant Mason "talked crazy" and was "cussing." Laketra said that Appellant Mason specifically told her, "Bitch, I'll kill again." Eventually, Farris, age fifteen at the time of the offense, and Appellant Mason began

_____

[1] Where the witnesses in this case share the same last name, we will refer to them by their first name. No disrespect is intended.

to fight. Appellant Mason had a knife; however, Owens took it from her. During the fight, Appellant Mason was biting Farris "like a pit bull," so Laketra hit Appellant Mason to get her off Farris. Laketra said that Appellant Mason went into the house and grabbed a broomstick, but Sabrina took the broomstick from Appellant Mason and struck Appellant Mason with it. Laketra then saw blood coming from a cut on Appellant Mason's eye. After approximately ten minutes, they stopped fighting. The victims got in the car and left.

Laketra, Sabrina, Farris, and Swift drove to Wilson's house to check on the children. Before Laketra left the area, Appellant Mason called her on the phone. Laketra was able to see Appellant Mason on the phone, standing outside of a black SUV waving a gun in her hand, but Appellant Mason could not see Laketra. Laketra tried to "ride past [Appellant Mason] real fast." When Laketra drove past the SUV, she saw the driver of the SUV and described him as a man with a dread lock hairstyle. Laketra later noticed the same SUV "on the side of her [car]" forcing her to "slid[e] and hit[] somebody's car[.]" She pulled her car to the side of the street, and the SUV pulled beside them. Appellant Mason's hand came out of the window of the SUV, and the victims said, "'We fixing to die.'"

Laketra heard shots and closed her eyes. When Laketra opened her eyes, her sister, Sabrina, had gotten out of the car. Laketra and the other passengers stayed inside Laketra's car for fear of being killed. Laketra panicked and later heard Sabrina say, "'I'm shot.'" Laketra and the other women then saw Sabrina "[fall] down real slow." Laketra called for help from a house nearby the shooting.

Laketra identified Appellant Mason as the shooter in a photographic lineup on the day of the offense and at trial. Laketra also identified Appellant Harris as the driver of the SUV in a photographic lineup on the day of the offense, which was admitted as an exhibit at trial. Laketra was unable to identify Appellant Harris as the driver of the SUV at a previous hearing in May 2009, because he had a different hairstyle.

On cross-examination by Appellant Mason, Laketra was questioned regarding her preliminary hearing testimony and the statement she gave police soon after the shooting. She acknowledged testifying at the preliminary hearing that she closed her eyes during the shooting. She acknowledged telling the police that she drove to Wilson's house after the initial fight to get two crowbars. She testified at trial, however, that the crowbars had been in the car all along.

On cross-examination by Appellant Harris, Laketra testified that she had never seen Appellant Harris before she drove by him at the time of the shooting. He was not involved in the earlier confrontations. Laketra further acknowledged getting mad after she spoke to Appellant Mason on the phone the evening of March 20.

On redirect examination, Laketra's police statement was admitted as an exhibit. Laketra testified that the crowbars had been in the car before the fight and that the women did not take them out of the car.

Sherika Swift, a long time friend of Sabrina and Laketra, testified consistently with the testimony of Laketra. She additionally said that on the day before the offense, Laketra allowed her to use her car. Swift drove Sabrina to the home of Renaldo Wilson, Swift's boyfriend at the time, to drop off their children. As Swift backed out of the driveway, she "bumped" a car that belonged to Derwin Owens, Appellant Mason's boyfriend. Swift approached the car to apologize and heard a voice from the back say, "She hit your car." Swift replied, "Bitch, I know I hit his car." Swift apparently returned to her car, and Appellant Mason approached Swift's car saying, "Who's the bitch?" Appellant Mason was "hollering" and telling Swift to get out of the car. Swift did not respond and attempted to leave. As she pulled off, Appellant Mason kicked the car.

The next day, Swift drove back to Wilson's house to pick up her child. Swift said Sabrina, Laketra, and Shamika went with her. Laketra asked Wilson about her car, and he told her to ask Appellant Mason and Owens. As Swift drove down the street, she saw Owens and asked, "'What happened to the car? What happened last night?'" Swift said that Owens told her, "'You better leave before I put my bitch on you.'" The women then saw Appellant Mason come outside.

Swift said that they backed up the car and asked Appellant Mason about the incident with the car. Swift stated that Appellant Mason taunted them, telling them to get out of the car and "jack or whatever." Although Laketra said they did not want to fight, the women eventually fought in Owens's front yard. Swift did not observe how the fight started. As the fight was ending, Appellant Mason said, "I got you hoe's. I got you . . . . It ain't over with. I got you hoes."

Within five minutes after the fight, Swift saw Appellant Mason standing beside a black SUV with a gun in her hand. Swift had not seen either the SUV or the gun during the earlier events. She saw Appellant Harris in the driver's seat with the window down. As the women drove past the black SUV, it began chasing them. The women's car slid and hit another car. The SUV pulled alongside their car, and Swift heard a woman's voice say, "These bitches got me f----- up. I'm going to make The First 48 tonight."[2] Swift then saw shots being fired from the right side of the SUV at the women in the car. Swift and Farris, who were both in the back seat, ducked. One bullet entered the window near where Swift was sitting and another went in the roof of the car. After the SUV pulled away, Swift

---

[2]Appellant Harris's brief on appeal explains the reference: "The First 48 is a true-crime television drama-documentary featuring real-life police investigations in various cities including Memphis."

discovered Sabrina had been shot and was lying outside of the car near a driveway.

On cross-examination by Appellant Mason, Swift acknowledged that she had previously testified that she did not see who fired the shots. On cross-examination by Appellant Harris, Swift testified that Appellant Harris was not present for the incident at Wilson's house on March 20. He also was not present for the fight on March 21 when Appellant Mason said, "It ain't over with. I got you hoes." Swift acknowledged telling the police that Farris followed Appellant Mason onto Owens's property before the fight began, but she denied this at trial. At the time of the shooting, the passenger side of the SUV was positioned next to the driver's side of the women's car.

On redirect examination, Swift testified that she previously told the police that Appellant Harris was driving the SUV and Appellant Mason was in the front passenger seat. Swift's police statement was admitted as an exhibit.

Shemika Farris testified substantially the same as Laketra and Swift. After the fight, when the women drove by the SUV, Farris saw Appellant Mason with a gun in her hand about to get in the SUV. On cross-examination by Appellant Mason, Farris denied that the women were looking for Appellant Mason to start a fight with her. She acknowledged that she did not tell police that Appellant Mason was in the front passenger seat of the SUV at the time of the shooting. On cross-examination by Appellant Harris, Farris testified that when Laketra first saw that Appellant Mason had a gun, Laketra was going to hit Appellant Mason with the car to prevent her from shooting the women. She acknowledged that she told the police that Laketra was going to hit Appellant Mason but changed her mind when Laketra saw that Appellant Mason had a gun. On redirect, Farris testified that she told the police Appellant Mason was the person who shot Sabrina. Farris's police statement was admitted as an exhibit.

Rernardo Wilson testified that he was dating Swift at the time of the offense and that his cousin, Derwin Owens, was dating Appellant Mason. The day before the shooting, Wilson saw Appellant Mason standing outside Swift and Sabrina's car, arguing. The next day, the victims came and left his house twice. After they left the second time, Appellant Mason arrived as the passenger in a black SUV driven by a man with dread locks. Appellant Mason got out and told Wilson, "Call them bitches back." Wilson saw Appellant Mason standing near the hood of the SUV and called Swift to tell her not to return because Appellant Mason had a gun. By the time he called, the women were already at a nearby intersection. After the women turned onto his street, Appellant Mason got into the SUV, which followed the women. After the cars turned the corner, Wilson heard gunshots.

Teresa Harris was outside on her front porch on the day of the shooting. She saw a car stop in front of her neighbor's house. A black SUV with a woman in the passenger seat

came from the same direction as the other car. The women in the first car got out and started running. Teresa then saw the woman in the SUV point a gun out the window and fire four or five times, shooting one of the women in the other car.

On the day of the shooting, Cassandra Allen-Wolfe was inside her house when she heard four gunshots. She looked out her window and a woman knocked on her door. Allen-Wolfe went outside and saw another woman screaming that she had been shot. Allen-Wolfe called 911. Her father's car, parked in front of her house, had a bullet hole in the trunk. A photograph depicting Allen-Wolfe's house and her father's car in front of the house was admitted as an exhibit.

Sergeant Ricky Davison of the Memphis Police Department testified that he was assigned as the crime scene investigator for this case. He described the scene, including the location of the cars, the bullet holes in the cars, and where Sabrina was lying when paramedics treated her. A number of photographs of the scene and a diagram of the scene were admitted as exhibits.

Sergeant David Parks of the Memphis Police Department testified that he coordinated the investigation of this case. Although all the witnesses identified Appellant Mason as the shooter, Sergeant Parks testified that he mistakenly wrote a report stating that Appellant Harris was the shooter. He called the mistake a "typo."

Special Agent Cervinia Braswell, a forensic scientist with the firearms identification unit of the Tennessee Bureau of Investigation, examined a bullet removed from Sabrina's breast and a bullet removed from the trunk of the car parked in front of Allen-Wolfe's house. Special Agent Braswell determined that the bullets were fired from the same gun.

Dr. Miguel Laboy of the Shelby County Medical Examiner's Office performed the autopsy of Sabrina Campbell. Dr. Laboy testified and described two gunshot wounds on Sabrina's body. One bullet entered the lower left back, perforated the left iliac vessel and the stomach, and exited on the front right side of the abdomen. The other bullet entered the right breast from front to back. Dr. Laboy recovered the bullet from Sabrina's body. Dr. Laboy testified that the gunshot wounds caused Sabrina's death and that the manner of death was homicide. A number of autopsy photographs and an autopsy diagram were admitted as exhibits.

Neither Appellant Mason nor Appellant Harris presented proof. The jury convicted Appellant Mason of the lesser included offense of second degree murder and three counts of aggravated assault. The jury convicted Appellant Harris of the lesser included offense of facilitation of criminally negligent homicide and three counts of facilitation of aggravated assault.

**Sentencing Hearing.** At the sentencing hearing held on July 21, 2010, Charla Campbell, Sabrina's mother, testified that Sabrina, age nineteen when she died, had two children, ages one and four. Charla testified that the children had sleepless nights and cried often, wanting their mother. Charla also had difficulty coping with the loss of Sabrina, and she lost her job and sought counseling as a result of Sabrina's death.

Laketra testified that since Sabrina's death, she had been diagnosed with depression, which required her to take medicine. She also had to move from the apartment where she had lived with Sabrina.

Minerva Mason, Appellant Mason's mother, testified that Appellant Mason had become a better person and a "good adult" since she had been incarcerated. However, Appellant Mason's seven-year-old son was experiencing behavioral problems at school as a result of his mother being absent. Appellant Mason introduced as an exhibit to the hearing a "Letter of Participation" from the Shelby County Sheriff's Office. The letter stated that Appellant Mason had been participating in several programs, including "Commitment to Change," "Job Readiness," "Moral Reconation Therapy," "Anger Management," "Parenting," "Addictive Behavior," and "Literacy." In allocution, Appellant Mason told the victim's family that she was "sorry for [their] loss."

A letter from Shane Norman, Appellant Harris's uncle, praising Appellant Harris's character was also admitted as evidence at the hearing. The letter described Appellant Harris as "without a shadow of doubt one of the kindest and gentlest human beings you'd ever meet." The letter related how Appellant Harris, after the recent murder of a young cousin, "served as the primary positive influence for other young impressionable men in our family, and thwarted all conversations and thoughts of retribution and retaliation." In allocution, Appellant Harris stated that he was sorry "for this situation" and that he "regret[ted] what happened."

The presentence investigation report for each defendant was also admitted into evidence at the hearing. Appellant Mason's report showed that she was twenty-six years old and had completed the tenth grade. She had worked at two different fast food restaurants for approximately six months each between December 2008 and December 2009. Since the date of the offenses, she had been diagnosed with depression requiring her to take medicine. Appellant Mason's criminal history included one conviction for driving with a suspended, cancelled, or revoked license, for which she served one day in jail.

Appellant Harris, age twenty-eight, had obtained a general education diploma and attended the University of Phoenix. He had worked as a bouncer at a night club from August 2008 to March 2009, as a laborer during May 2010, and as a server at a country club since June 2010. He had an eight-year-old daughter, a son whose age was not reported, and four

stepchildren between eleven and sixteen years old. Harris was previously convicted of simple assault, two misdemeanor thefts, aggravated criminal trespass, and failure to appear.

Following the evidence at the hearing, the trial court sentenced Appellant Mason to twenty-two years for second degree murder and five years for each count of aggravated assault, to be served consecutively for a total effective sentence of thirty-seven years. Appellant Harris was sentenced to eleven months and twenty-nine days for facilitation of criminally negligent homicide and four years for each count of facilitation of aggravated assault, to be served consecutively for an effective sentence of twelve years and eleven months and twenty-nine days. This appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence.** Appellants Mason and Harris contest the sufficiency of the evidence to support their convictions. When reviewing the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this Court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in the State's favor. Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Issues regarding the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the jury as the trier of fact, and this court does not reweigh or reevaluate the evidence. Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

Appellant Mason contends that the evidence showing that she was the shooter was insufficient. She argues that Laketra was the only witness who saw Appellant Mason shooting and that Sergeant Parks's report that witnesses identified Appellant Harris as the shooter demonstrated that Appellant Mason was not the shooter. The State responds that the evidence supported Mason's convictions. We agree with the State.

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. April 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator, just like guilt generally, may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). This Court has stated that the identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In addition, this Court has held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

Here, both Laketra and Farris testified at trial that Appellant Mason shot at them from the black SUV. Although this testimony alone was sufficient to prove Appellant Mason's identity as the shooter, see id., several other witnesses also testified that they heard Appellant Mason threaten the victims and saw her waving a gun while standing outside the black SUV moments before the shooting. Accordingly, the evidence was sufficient to prove Appellant Mason's identity as the shooter. She is not entitled to relief on this issue.

Appellant Harris argues that "the State offered no testimony or other proof to show that Harris was aware of Mason's state of mind" and that as a result, "no rational trier of fact could find that Harris knew Mason intended to commit the underlying felonies" in order to convict him of facilitation. The State responds, and we agree, that the evidence was sufficient to support the convictions.

Appellant Harris was convicted of the facilitation of both criminally negligent homicide and aggravated assault. Facilitation occurs "if, knowing that another intends to commit a specific felony . . ., the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403 (a). Determining whether Appellant Harris knew of Appellant Mason's intent required the jury to consider Appellant Harris's mental

state, which is a factual question for the jury to resolve. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010) (citing State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000)). The Tennessee Supreme Court has explained that circumstantial evidence is often the only means of proving mental state: "[W]hile a defendant's mental state is rarely subject to proof by direct evidence, it is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' from surrounding facts and circumstances." Brown, 311 S.W.3d at 432 (citations and quotations omitted).

In this case, the evidence supports Appellant Harris's convictions for facilitation. Witnesses testified that Appellant Harris was in the SUV with his window down while Appellant Mason was standing outside the vehicle, calling the victims, and waving a gun in the air. Rernardo Wilson called the victims to warn them rather than tell them to return based on Appellant Mason's having a gun. Once the victims drove past Appellants Mason and Harris, Appellant Harris accelerated in pursuit, forcing the victims off the road and into another car. After Appellant Harris caught up with the victims, he positioned Appellant Mason, in the front passenger seat of the SUV, next to the victims' car, where she shot at them. Based on this evidence, the jury could have reasonably inferred that Appellant Harris was aware of Appellant Mason's intent. Accordingly, the evidence was sufficient to convict Harris of facilitation. He is not entitled to relief on this issue.

**II. Evidentiary Issues.**[3] Appellant Harris argues that the trial court erred in ruling on the admissibility of various evidence during the course of trial. The State responds that the trial court did not commit reversible error. We agree with the State.

The Tennessee Supreme Court has generally held, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)). This court has also concluded that the issue of hearsay and whether it is admissible as an exception to the hearsay rule is reviewed de novo, as a matter of law. State v. Gilley, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008).

Appellant Harris first argues that the trial court erred in admitting the police

---

[3] We have combined and re-ordered Appellant Harris's evidentiary issues under one heading for clarity.

statements of Laketra, Swift, and Farris as prior consistent statements. Although he acknowledges that prior consistent statements are admissible to rehabilitate a witness, see, e.g., State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993), Appellant Harris contends that the victims' credibility was not sufficiently questioned on cross-examination to require rehabilitation and that the admission of the victims' complete written police statements exceeded the scope of permissible rehabilitation. In response, the State argues that the trial court properly admitted the victims' police statements to rehabilitate their credibility. We agree with the State.

Under certain circumstances, a prior consistent statement is admissible to rehabilitate a witness. In State v. Benton, this court stated:

> [U]nder general evidentiary rules, prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988); see also Floyd "Butch" Webb v. State, No. E2006-02352-CCA-R3-PC, 2007 WL 2570201, at *13 (Tenn. Crim. App. Sept. 7, 2007); State v. Reginald Henderson, No. W2000-00607-CCA-R3-CD, 2001 WL 912759, at *9 (Tenn. Crim. App. Aug. 10, 2001); State v. Gerald Leander Henry, No. 01C01-9505-CR-00161, 1999 WL 92939, at *27 (Tenn. Crim. App. Feb. 25, 1999); State v. Terry Stephens, No. 01C01-9709-CR-00410, 1998 WL 603144, at *4 (Tenn. Crim. App. Aug. 24, 1998). Although prior consistent statements may be admissible to rehabilitate a witness, "trial courts should be mindful of the need to limit credibility bolstering evidence to that which they, in their discretion, determine will not be unduly prejudicial to the opponent of such evidence." State v. Tizard, 897 S.W.2d 732, 747 (Tenn. Crim. App. 1994); see also State v. Livingston, 907 S.W.2d 392, 398 (Tenn. 1995) (holding that a twenty-minute audio recording in which the minor rape victim detailed the crime to a Child Protective Services agent and the agent made judgmental remarks about the defendant was not admissible as a prior consistent statement because it exceeded the scope of rehabilitation warranted by the "mild[]" cross-examination).

Here, Laketra, Swift, and Farris were cross-examined regarding contradictions in their trial testimony, preliminary hearing testimony, and police statements. Each cross-examination directly challenged the victims' ability to identify the Appellants and their credibility. As a result, the victims' police statements were admissible as prior consistent statements to rehabilitate their credibility. Furthermore, admitting the complete statements did not exceed the scope of rehabilitation warranted by the cross-examinations. The

-11-

statements, the longest of which was approximately four and a half pages, were largely identical to the victims' trial testimony and were not unduly prejudicial to Appellant Harris. The trial court further protected against undue prejudice by instructing the jury to consider the statements only for the limited purpose of assessing the victims' credibility and not as substantive evidence. See State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001) (holding there is a presumption that the jury follows the trial court's instructions). The trial court, therefore, did not abuse its discretion in admitting the victims' police statements.

Appellant Harris next challenges the admission of Appellant Mason's statement, spoken immediately before shooting at the victims, that she was going to be on "The First 48." He asserts that the admission of this out-of-court statement by his non-testifying codefendant violated his constitutional right to confrontation under Bruton v. United States, 391 U.S. 123, 135 (1968), and that the violation was not harmless. The State responds that Appellant Harris waived this claim based on a failure to object at trial. See Tenn. R. Evid. 103(a) (requiring a timely objection to preserve a challenge to an evidentiary ruling). Alternatively, the State argues that the trial court did not err because Appellant Mason's statement was not given in a custodial setting nor did it implicate Appellant Harris such that Bruton protections applied. The State also asserts that the statement was admissible against Appellant Harris under the hearsay exception for statements made by a co-conspirator in the furtherance of a conspiracy. See Tenn. R. Evid. 803(1.2)(E). We conclude that the trial court did not err in admitting this evidence.

As an initial matter, we determine, contrary to the State's argument, that Appellant Harris has not waived this issue for a failure to object at trial. A defendant must timely object to an evidentiary ruling in order to preserve the issue for appeal. Tenn. R. Evid. 103(a). Here, the record clearly reflects that Appellant Harris objected to the statement, and waiver based on a failure to object is inappropriate.

Turning to the merits of Appellant Harris's claim, we note that whether Appellant Mason's statement is hearsay is central to the resolution of this issue. Rule 801(c), defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802.

In Bruton, the United States Supreme Court held that the admission in a joint trial of a codefendant's hearsay statements incriminating the defendant violated the defendant's right of cross-examination guaranteed by the Confrontation Clause. 391 U.S. at 136-37. The Tennessee Supreme Court reiterated, "The Bruton rule proscribes, generally, the use of one codefendant's confession to implicate the other as being violative of the nonconfess[ing] codefendant's Sixth Amendment right of confrontation." State v. Elliot, 524 S.W.2d 473,

477 (Tenn. 1975). However, a statement that is not hearsay because it is offered to prove something other than the truth of the matter asserted does not implicate the Confrontation Clause under Bruton. Tennessee v. Street, 471 U.S. 409, 414 (1985); State v. Price, 46 S.W.3d 785, 804 (Tenn. Crim. App. 2000); see also United States v. Inadi, 475 U.S. 387, 398 n.11 (1986) (stating that nonhearsay does not violate the defendant's right to confront witnesses); Anderson v. United States, 417 U.S. 211, 220 (1974) ("[S]ince the prosecution was not contending that anything [the non-testifying defendants] said at the election contest was true, the other defendants had no interest in cross-examining them so as to put their credibility in issue.") (internal footnote omitted); White v. Lewis, 874 F.2d 599, 603 (9th Cir. 1989) ("Because this testimony was not used for the truth of the matter asserted by the out-of-court declarant, it was not hearsay, and Bruton is inapposite."); United States v. Keith McCain, No. 03 C 4362, 95 CR 509, 2003 WL 22706913, at *1 (N.D. Ill. Nov. 14, 2003) ("If, however, the out-of-court confession is not hearsay, because it is a co-conspirator's statement, or is admissible under one of the exceptions to the hearsay rule, Bruton does not apply."); United States v. Andreas, 23 F. Supp. 2d 835, 844 (N.D. Ill. 1998) ("Bruton is inapplicable to nonhearsay statements being offered to show that the statement was made and not for its truth.").

Here, the trial court overruled Appellant Harris's objection based, in part, on its determination that the statement was not hearsay. The trial court ruled that the statement was admissible to prove inferentially Appellant Mason's premeditation and intent to kill, as relevant to the charges of first degree murder and facilitation of first degree murder. We agree. Appellant Mason's statement that she was going to be on "The First 48" was not offered to prove the truth of the matter asserted, that Appellant Mason would, in fact, be on the television show. Rather, the statement went to Appellant Mason's intent.[4] Accordingly, because Appellant Mason's statement was not hearsay, it did not implicate Appellant Harris's right of confrontation under Bruton. Appellant Harris is not entitled to relief on this issue.

Appellant Harris next argues that the trial court erroneously admitted an autopsy photograph because the cause of death was not a contested issue at trial and because the photograph "did nothing to enhance the testimony of Dr. Laboy." As a result, according to Appellant Harris, the photograph was inflammatory and prejudicial. The State responds that the trial court did not abuse its discretion in admitting the photograph. We agree with the

---

[4] Although the trial court determined that the statement was relevant to Appellant Mason's intent, the statement also was relevant to the nonhearsay purpose of proving the effect on the listener. See State v. Venable, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (holding that a statement introduced for its effect on the listener is not hearsay); Neil P. Cohen et. al, Tennesse Law of Evidence § 8.01, at 8-23 (5th ed. 2005) ("[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair are not hearsay . . . because [the statement] is not used to prove the truth of the matter asserted in the statement."). Swift testified that immediately after the women heard this statement, they all ducked down in the car.

-13-

State.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102-03 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951). However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. Banks, 564 S.W.2d at 951; see also Tenn. R. Evid. 401 and 403. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

Here, during Dr. Laboy's testimony, the trial court held a bench conference to consider the admissibility of the photograph. The photograph depicts the victim's abdomen and chest. Sutures run vertically from the belly button to the bottom of the sternum and horizontally below the victim's breasts. The photograph also depicts a gunshot wound to the abdomen and to the right breast. In finding the photograph admissible, the trial court stated:

> [The photograph] is not particularly gruesome, it is not particularly inflammatory. It is a homicide case. Tennessee case law indicates that photographs of the victim in a homicide case are admissible if they supplement the testimony of a medical examiner. If the intent and premeditation are denied, as it is in this case, they're admissible for those reasons. . . . It's not a bloody, gruesome, horrifying photograph. It shows an injury and it shows medical interventions that were used in order to try to save this woman's life. Tennessee law also indicates that in homicide cases, all photographs necessarily are unpleasant. Simply because a photograph is unpleasant doesn't meant [sic] that it is inadmissible. The Court does not find that the probative value is substantially outweighed by the danger of unfair prejudice. The State has to prove this as an intentional premeditated killing. It has been denied by both parties and this photograph does supplement the testimony of the medical examiner. . . . [The photograph] will be admitted as an exhibit.

During Dr. Laboy's testimony, he referred to the autopsy photograph at issue in describing

-14-

the victim's wounds, an "exit defect of the gunshot wound on the abdomen on the right side, close to the midline" and an "entry defect of the gunshot wound on the right breast." He also referred to the photograph in describing the trajectory of the bullets and the damage they caused internally. He described "the [surgical] incision closed with sutures."

We conclude that the trial court properly admitted the autopsy photograph. First, it was adequately verified and authenticated. Second, it was relevant to at least two issues for the jury: whether Appellant Mason caused Sabrina's death, see T.C.A. § 39-13-201 ("Criminal homicide is the unlawful killing of another person . . . ."), and whether Appellant Mason acted with premeditation, see State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (citing Brown, 836 S.W.2d at 542) (stating that the infliction of multiple wounds is evidence of premeditation). Third, the photograph's probative value was not substantially outweighed by unfair prejudice under Rule 403. The photograph corroborated Dr. Laboy's testimony and served as an aid to the testimony, facilitating his description of the victim's wounds. In considering the danger of unfair prejudice, we recognize that the photograph was graphic. Nevertheless, it was not gruesome or inflammatory. We cannot conclude, therefore, that the graphic nature of the photograph substantially outweighed its probative value. Consequently, Appellant Harris has not shown that the trial court abused its discretion, and he is not entitled to relief.

Appellant Harris challenges the trial court's exclusion of evidence that Sabrina committed a violent act in the past, evidence Appellant Harris sought to introduce in order to prove that Sabrina was the first aggressor and that Appellant Mason was acting in self-defense. He argues that the trial court abused its discretion in excluding the evidence and violated his constitutional right to present a defense. In response, the State argues that Appellant Harris was not entitled to present evidence in support of a theory that Appellant Mason killed out of self-defense. According to the State, only Appellant Mason could have introduced such evidence because "first aggressor is only available to the defendant charged with [the] crime that inflicted the injury on the victim, rather than any collateral defendants who might have facilitated the crime." Additionally, the State argues that the proof did not support a claim of self-defense to which this evidence of Sabrina's violent character would be relevant. We conclude that the trial court did not err in excluding this evidence.

A defendant has a constitutional right under due process to present a defense and to offer testimony. State v. Flood, 219 S.W.3d 307, 316 (Tenn. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 294 (1973); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000)). Such a right, however, is not absolute, and a defendant must comply with procedural and evidentiary rules in presenting a defense. Id. (citing Chambers, 410 U.S. at 302). "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." Id. (citing United States v. Scheffer, 523 U.S. 303, 308 (1998)). A

court, in considering whether the exclusion of evidence amounts to a constitutional violation of a defendant's right to present a defense, considers "(1) [w]hether the excluded evidence is critical to the defense; (2) [w]hether the evidence bears sufficient indicia of reliability; and (3) [w]hether the interest supporting exclusion of the evidence is substantially important." Id. (citing Brown, 29 S.W.3d at 434-35).

Evidence of a victim's character for violence, such as that at issue here, is subject to several evidentiary rules. See Tenn. R. Evid. 404(a)(2) (allowing for the use of evidence pertaining to the victim's character); Tenn. R. Evid. 405 (governing the methods of proving character). This court has further explained the use of first-aggressor evidence under the rules, "In cases such as this, the only basis for the introduction of a victim's reputation for prior acts of violence is to corroborate the victim was the first aggressor. Thus, before such evidence is admissible, the evidence must establish an issue which makes such evidence relevant, and, therefore, admissible." State v. Robinson, 971 S.W.2d 30, 40 (Tenn. Crim. App. 1997) (citations omitted). Because first-aggressor evidence pertains only to a claim of self-defense, the evidence must establish self-defense as an issue before first-aggressor evidence is relevant and, consequently, admissible. See Tenn. R. Evid 401 (defining evidence as relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible.").

Tennessee Code Annotated section 39-11-611(b)(2) provided for the defense of self-defense at the time of the March 21, 2009 shooting as follows:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2) (2008). Acts committed in self-defense are justified, and self-defense is a complete defense to crimes of violence. See T.C.A. § 39-11-601; State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Reliance on self-defense is not limited to the exact moment of the assault [but] may be considered in connection with the entirety of

-16-

the events leading to the assault." Ivy, 868 S.W.2d at 727 (citing Allsup v. State, 73 Tenn. 362 (1880)).

Here, Appellant Harris cross-examined Laketra concerning Sabrina's character. After Laketra testified on cross-examination that Sabrina was not a violent person, Harris proffered additional testimony from Laketra outside the presence of the jury. Laketra acknowledged that Sabrina threw a glass candle holder at her in July 2008. Following the proffer, the court ruled that the evidence was inadmissible. After generally discussing the evidentiary rules governing character evidence, the trial court stated:

> [Character traits] are admissible under some circumstances and in a homicide case, if there is an issue of self defense, if there is an issue as to who was the first or initial aggressor, then those character traits become admissible.
>
> Mr. Harris and Ms. Mason can't have inconsistent defenses. . . . [Counsel for Mason] and Ms. Mason are not saying this is self defense. They're not saying that Ms. Mason shot at anybody. Ms. Mason's theory is that she shot at no one. She was not present and this is a case of mistaken identity.
>
> Mr. Harris can certainly take a position that this is self defense of some sort and again, that would be inconsistent with his theory, if he has a theory and I understood his theory to be that he was not facilitating this crime, that he did not knowingly provide assistance to Ms. Mason when she . . . killed one person and committed an aggravated assault against two [sic] other people. . . .
>
> There is nothing on the record right now that would indicate that self defense is an issue in this case. Whether or not Ms. Mason claims it was self defense or not [sic], there's nothing on this record that would indicate that whatever happened on March 21st[,] 2009, was a case of self defense. . . .
>
> . . . .
>
> . . . This testimony is not relevant and if at some point, if Mr. Harris presents proof or there is some proof on the record that would indicate that this is in fact a case of self defense, I will revisit as to whether or not the character of the victim may be admissible to show that the victim was the first or the initial aggressor . . . .

Appellant Harris did not offer any other evidence pertaining to self-defense or the victim's

-17-

character during the remainder of the trial.

We conclude that the trial court did not abuse its discretion in excluding the evidence. Even assuming that Harris was entitled to assert self-defense on behalf of his codefendant Mason, nothing in the record established that Appellant Mason acted in self-defense. As noted by the trial court, Appellant Mason's theory of the case was that she was not the shooter. Moreover, there was no proof that Sabrina or any of the other three victims posed an imminent danger to Appellant Mason at the time of the shooting, that Appellant Mason believed she was in imminent danger, or that any such belief was reasonable. Rather, the proof of the circumstances surrounding the killing demonstrated that Appellant Mason pursued the victims while they were trying to leave. As a result, self-defense was not at issue in the case, and the trial court properly excluded character evidence suggesting Sabrina was the first aggressor. Furthermore, the exclusion did not violate Appellant Harris's right to present a defense because the evidence was not relevant or critical to the defense. See Flood, 219 S.W.3d at 316. Appellant Harris is not entitled to relief on this issue.

Appellant Harris next challenges the trial court's refusal to instruct the jury on self-defense and various other lesser included offenses. Appellant Harris first contends that "the issue of self-defense was fairly raised based on Appellant Mason's putative fear of imminent death or serious bodily injury, and that the trial court's failure to offer an instruction on self-defense was in error." The State responds that the trial court properly denied the request. We agree with the State.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. Proceeding from this right to a jury trial is a defendant's "right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000) (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citing Abbot v. Am. Honda Motor Co., 682 S.W.2d 206, 209 (Tenn. Ct. App. 1984)); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is

de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

As we stated above, the law on self-defense at the time of these crimes required a defendant to prove that (1) he "ha[d] a reasonable belief that there [was] an imminent danger of death or serious bodily injury," (2) "[t]he danger creating the belief of imminent death or serious bodily injury [was] real, or honestly believed to be real at the time," and (3) "[t]he belief of danger [was] founded upon reasonable grounds." T.C.A. § 39-11-611(b)(2)(A)-(C) (2008).

Here, in a hearing outside the presence of the jury, the trial court considered Appellant Harris's request for a jury instruction on self-defense. It reviewed the trial evidence and the requirements for self-defense, and it determined that self-defense was not applicable:

> In order for the Court to charge self defense it has to be raised by the proof. . . . [I]f there's any proof that Ms. Mason may have acted in self defense, the Court has to charge [self defense]. . . . [I]t has to be fairly raised by the evidence and as I indicated earlier and after the Court has heard all the proof, there's nothing on the record that would raise self defense.

The record supports the trial court's refusal to instruct the jury on self-defense. As we discussed above, the record did not support any of the elements of self-defense. Appellant Harris relies on the fight earlier in the day on March 21, testimony that the victims may have been looking for Appellant Mason after the fight, and testimony that Laketra may have been preparing to run over Appellant Mason before Appellant Mason pulled a gun. He argues that these circumstances fairly raised the question of self-defense. Contrary to Appellant Harris's assertion, none of these circumstances are evidence of any imminent danger to Appellant Mason, or of her actual and reasonable belief of danger, at the time she pursued the victims and shot at them. We conclude, therefore, that the parties offered no evidence at trial that reasonable minds could have accepted in support of self-defense, and the trial court did not err in denying Appellant Harris's request to instruct the jury on self-defense. Consequently, Appellant Harris is not entitled to relief.

Harris also argues that the trial court erred in failing to charge numerous lesser included offenses. As lesser included offenses of facilitation of first degree murder, he asserts that the trial court should have charged facilitation of several offenses not involving homicide including: aggravated assault, reckless aggravated assault, reckless endangerment with a deadly weapon, simple assault, and misdemeanor reckless endangerment. He argues that the jury "could have determined that the extent of Harris' knowledge of Mason's intent and/or the extent of his substantial assistance reached only to" these lesser offenses. He also complains that the trial court did not instruct the jury on various inchoate offenses, including

"attempted facilitation, facilitation of attempt, and attempted facilitation of attempt of each of the following: second degree murder, voluntary manslaughter, reckless homicide, criminally negligent homicide, aggravated assault, reckless aggravated assault, reckless endangerment with a deadly weapon, simple assault, and misdemeanor reckless endangerment." He asserts that the evidence did not clearly establish "both the completion of the underlying felony committed by Ms. Mason and the completion of Harris' own facilitation, i.e., his substantial assistance" such that the court was relieved of the requirement to charge the jury on attempt. He contends that the trial court should have charged "attempted facilitation of attempt" because the jury "could have found . . . that his substantial assistance did not necessarily facilitate the completed felony but did facilitate an attempt of the underlying felony." Appellant Harris extends these same arguments to the charged offense of facilitation of aggravated assault, asserting that the trial court should have charged facilitation of three lesser offenses: reckless aggravated assault, reckless endangerment with a weapon, and misdemeanor reckless endangerment. He alleges the court should have instructed the jury on "attempted facilitation, facilitation of attempt, and attempted facilitation of attempt of each of the following: reckless aggravated assault, reckless endangerment with a weapon, simple assault, and misdemeanor reckless endangerment."

The State responds that the trial court did not commit reversible error in refusing to instruct the jury on these lesser offenses. Regarding the offense of facilitation of first degree murder, the State argues that the trial court correctly determined that all the lesser offenses of first degree murder that did not involve homicide were inapplicable because, due to Sabrina's death, no jury "would find that the defendant was guilty of lesser offenses not involving death." The State also asserts, while noting disagreement among panels of this court, that aggravated assault and assault are not lesser included offenses of first degree murder. The State further argues that any error was harmless because the evidence of Appellant Harris's guilt was overwhelming and because Appellant Harris was not prejudiced by the error. The State notes the improbability, considering the jury's verdict of guilt for the three counts of facilitation of aggravated assault on the surviving victims, that the jury would have convicted Harris of anything less than facilitation of aggravated assault for the charge resulting from Sabrina's death. The State argues that the trial court was correct to deny Appellant Harris's request to instruct the jury on attempt because the crimes were completed. Regarding the offenses of facilitation of aggravated assault, the State argues that, even assuming that the trial court erred in denying Appellant Harris's requested charge on lesser included offenses, there was no prejudice because the jury convicted him on the highest charged offense. We conclude that although the trial court erred in instructing the jury, any error was harmless.

In State v. Burns, the Tennessee Supreme Court outlined the test to determine if offenses constituted lesser included offenses:

-20-

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

> (1) a different mental state indicating a lesser kind of culpability; and/or
>
> (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>
> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>
> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

6 S.W.3d 453, 466-67 (Tenn. 1999). The court held that if an offense constitutes a lesser included offense pursuant to the aforementioned test, then the trial court needs to undergo the following two-step analysis before deciding whether an instruction on the lesser included offense is given to the jury:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. Pursuant to the test established in Burns, "an attempt to commit the offense charged" constitutes a lesser included offense. Id. at 467. However, the trial court must still conduct the two-step analysis in order to determine whether an instruction on the lesser included offense of attempt should be given to the jury. Id. at 469. The Tennessee Supreme Court has also noted that "where the evidence clearly establishes the completion of the crime, it is unnecessary for the trial court to charge the jury as to attempt." State v. Banks, 271 S.W.3d 90, 127 (Tenn. 2008). Any error in instructing the jury is considered under the harmless error doctrine. Garrison, 40 S.W.3d at 433-34; see also Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). "Failure to give a lesser-included offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial." State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002).

Here, Appellant Harris filed a request for a jury charge on lesser included offenses, including those listed above. Before the end of trial, the court conducted a hearing regarding the jury instructions and denied Appellant Harris's requests. After summarizing the Burns standard, the court stated:

> [C]ases since Burns have indicated that an attempt, a facilitation or solicitation is an included offense only if no proof exists of the completion of the crime and that attempts and facilitation should not be charged if there is no proof that the crime itself was not actually committed. There's no question on this record that Ms. Campbell was in fact killed. There's no question that this is not an attempted first degree murder, not an attempted killing because this is a completed act. There's no question that aggravated assault was actually a completed act in this case. It's just a question of whether or not Ms. Mason committed this crime or whether Mr. Harris facilitated the commission of these crimes. . . . [T]he proof in this case actually does indicate that the crime was in fact completed, whether it was first degree murder or the aggravated assault.

As lesser included offenses of facilitation of first degree murder, the trial court charged facilitation of second degree murder, facilitation of voluntary manslaughter, facilitation of reckless homicide, and facilitation of criminally negligent homicide. As a lesser included offense of facilitation of aggravated assault, the trial court charged facilitation of assault.

Considering first the court's instructions on lesser included offenses of facilitation of first degree murder, we conclude that the trial court erred in not charging facilitation of aggravated assault, reckless aggravated assault, simple assault, and misdemeanor reckless endangerment. This court has issued divergent decisions on the question of whether assault

and related offenses that do not involve death are properly charged as lesser included offenses of homicide offenses. Compare State v. Lia Bonds, No. W2006-01943-CCA-R3-CD, 2007 WL 3254711, at *10-12 (Tenn. Crim. App. Nov. 2, 2007), perm. app. denied (Tenn. Apr. 14, 2008) (collecting authority and holding that misdemeanor reckless endangerment and assault are lesser included offenses of second degree murder), and State v. Paul Graham Manning, No. M2002-00547-CCA-R3-CD, 2003 WL 354510, at *6 (Tenn. Crim. App. Feb. 14, 2003), perm. app. denied (Tenn. Dec. 15, 2003) (holding that aggravated assault and assault are lesser included offenses of first degree premeditated murder), with State v. John C. Walker, III, No. M2005-01432-CCA-RM-CD, 2005 WL 1798758, at *8-11 (Tenn. Crim. App. July 28, 2005), perm. app. denied (Tenn. Dec. 19, 2005) (collecting authority and holding that aggravated assault and assault are not lesser included offenses of first degree premeditated murder). We agree with the Burns analysis articulated by this court in Paul Graham Manning:

> [F]irst degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). An aggravated assault is committed, on the other hand, when the accused intentionally, knowingly, or recklessly causes serious bodily injury to another. See id. § 39-13-102(a)(1)(A), (a)(2)(A). Similarly, an assault is committed when one "[i]ntentionally, knowingly or recklessly causes bodily injury to another." Id. § 39-13-101(a)(1). The mens rea of intentional includes the mens reas of knowing and reckless. See id. § 39-11-301(a)(2). A killing certainly includes serious bodily injury (as well as "mere" bodily injury). Thus, all of the statutory elements of these forms of aggravated assault and assault are included within the statutory elements of first degree premeditated murder, and they are therefore lesser-included offenses under part (a) of the Burns test.

Paul Graham Manning, 2003 WL 354510, at *6; see also Lia Bonds, 2007 WL 3254711, at *11 (quoting the analysis from Paul Graham Manning). By this same reasoning, first degree premeditated murder also includes reckless aggravated assault, see T.C.A. § 39-13-102(a)(1)(B)(i) (defining the offense as the reckless commission of an assault accompanied by, as relevant here, serious bodily injury to another), and misdemeanor reckless endangerment, see T.C.A. § 39-13-103(a) (defining the offense as "recklessly engag[ing] in conduct that places or may place another person in imminent danger of death or serious bodily injury"). It was error for the trial court to deny Appellant Harris's request to charge the jury on these offenses.

It was not error, however, for the trial court to refuse to instruct the jury on reckless endangerment with a deadly weapon. Because this offense requires as an element the use of a deadly weapon, Id. § 39-13-103(b)(2), and because first degree premeditated murder does not require the use of a deadly weapon, id. § 39-13-202(a)(1), reckless endangerment

-23-

with a deadly weapon is not a lesser included offense of first degree premeditated murder under the Burns test. State v. Phedrek T. Davis, No. M2006-00198-CCA-R3-CD, 2007 WL 2051446, at *19 (Tenn. Crim. App., at Nashville, July 19, 2007), aff'd, 266 S.W.3d 896, 898 (Tenn. 2008).

The trial court also properly refused to instruct the jury on attempted facilitation, facilitation of attempt, and attempted facilitation of attempt. The trial court correctly determined that all the proof at trial indicated that all the alleged crimes were completed such that instructions on attempt were unnecessary. Banks, 271 S.W.3d at 127.

Having found error in the trial court's refusal to instruct the jury on the lesser included offenses of facilitation of aggravated assault, reckless aggravated assault, simple assault, and misdemeanor reckless endangerment, we must consider whether the error was harmless. After considering the whole record, we conclude that the any error was harmless beyond a reasonable doubt. The jury, when instructed on the offenses of facilitation of aggravated assault and facilitation of assault of the three surviving victims, found Appellant Harris guilty of facilitation of aggravated assault, a Class D felony. The evidence on those three counts was identical to the evidence on the count arising from Sabrina's death, with the exception that Sabrina was shot and killed. As the State argues, it is therefore unreasonable to think that the jury would have convicted Appellant Harris of anything less than facilitation of aggravated assault had the court instructed the jury on the lesser included offenses not involving death. Under the trial court's instructions, however, Appellant Harris was convicted of Class A misdemeanor facilitation of criminally negligent homicide, a much less serious offense. Consequently, the trial court's error did not result in any prejudice, and Appellant Harris is not entitled to relief on this issue.

Turning next to the court's instructions for lesser included offenses of facilitation of aggravated assault, we conclude it was not error for the trial court to refuse to instruct the jury on the offenses of facilitation of reckless aggravated assault, reckless endangerment with a deadly weapon, and misdemeanor reckless endangerment. The indictment alleged aggravated assault committed by causing the victims to reasonably fear imminent bodily injury through the use of a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(ii). None of the offenses that form the basis of Appellant Harris's complaint here are lesser included offenses of such an aggravated assault. See State v. Goodwin, 143 S.W.3d 771, 776 (Tenn. 2004) (holding that reckless aggravated assault is not a lesser included offense of aggravated assault committed by causing the victim to reasonably fear imminent bodily injury through the use of a deadly weapon because reckless aggravated assault entails the additional element of bodily injury); State v. Moore, 77 S.W.3d 132, 135 (Tenn. 2002) (holding that reckless endangerment with a deadly weapon is not a lesser included offense of aggravated assault committed by causing the victim to reasonably fear imminent bodily injury through the use of a deadly weapon due to reckless endangerment's additional element of the risk of

-24-

imminent danger).[5]  Harris is not entitled to relief on this issue.

**Sentencing.**  Appellants Mason and Harris challenge the trial court's sentencing orders.  Until recently, this court reviewed issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. In State v. Bise, 380 S.W.3d 682, (Tenn. 2012), the Tennessee Supreme Court adopted a new standard of review for sentencing and stated:

> [W]hen the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the "presumption of correctness" ceased to be relevant.  Instead, sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a "presumption of reasonableness."

Id. at 708 at *19.  Accordingly, we now review challenges to the trial court's application of mitigating or enhancement factors under an abuse of discretion standard with a "presumption of reasonableness." Id.  The defendant maintains the burden of showing the impropriety of the sentence.  T.C.A. § 40-35-401(d), Sentencing Comm'n Comments.  If the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the sentencing act, this court may not disturb the sentence even if a different result was preferred.  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

As an initial matter, Appellant Harris argues that the trial court improperly denied alternative sentencing because it misapplied the factors that can outweigh a defendant's favorable consideration for alternative sentencing.  Specifically, he asserts that the trial court improperly found that he had an extensive criminal history, that measures less restrictive than confinement had been unsuccessful, and that incarceration was necessary for deterrence.  The State responds, and we agree, that the trial court properly applied the factors weighing against granting Appellant Harris alternative sentencing.

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001).  Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class

---

[5] The reasoning of Moore also precludes, as a lesser included offense of the form of aggravated assault alleged here, misdemeanor reckless endangerment because it requires the same element of risk of imminent danger.

C, D, or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" T.C.A. § 40-35-102(6)(A). However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Id. § 40-35-102(6)(D). A trial court should consider the following when determining whether there is "evidence to the contrary" indicating that an individual should not receive alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). When a defendant is considered a favorable candidate for alternative sentencing, the State has the burden of presenting evidence to the contrary. See State v. Bingham, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995), overruled on other grounds by Hooper, 29 S.W.3d at 9. However, the defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. See id. at 455-56 (citing T.C.A. § 40-35-303(b)).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. T.C.A. § 40-35-303(a). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b). In addition, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. See State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background

-26-

and social history, his present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978)). In addition, the principles of sentencing require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4). Moreover, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed[,]" and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" Id. § 40-35-103(5). Our supreme court has held that truthfulness is also a factor which the court may consider in deciding whether to grant or deny probation. State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983) (citing State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981)).

Here, the trial court found that all of the factors to be considered as evidence contrary to ordering alternative sentencing applied to Appellant Harris. First, it determined that Harris had a long history of criminal conduct and that confinement was necessary to protect the community. T.C.A. § 40-35-103(1)(A). Appellant Harris challenges this finding on the ground that his criminal history is not "extensive." He asserts that because the trial court earlier in the hearing stated that his criminal history was not extensive, the trial court was precluded from finding a "long" history for the purposes of denying alternative sentencing. He further contends that the trial court impermissibly relied on his juvenile record in making this finding.

The trial court did not err in denying alternative sentencing based on the need to protect the community from Appellant Harris and that Appellant Harris had a long history of criminal conduct. Although the trial court stated that Harris's criminal record was not "extensive" for the purposes of consecutive sentencing, see id. § 40-35-115(b)(2), it determined that Appellant Harris had a "long" history for the purposes of denying alternative sentencing. Because statutory consideration for alternative sentencing and consecutive sentencing are distinct, the trial court did not err in concluding that Appellant Harris had a long history of criminal conduct but not an extensive history. The record shows that between 1995 and the instant offenses in 2009, Appellant Harris engaged in criminal conduct on eight occasions. Additionally, although a trial court cannot find the enhancement factor of additional criminal convictions beyond that necessary to establish the appropriate sentencing range based on a defendant's juvenile history, see State v. Jackson, 60 S.W.3d 738, 741-42 (Tenn. 2001), it may properly consider a juvenile record in denying alternative sentencing. See State v. Zeolia, 928 S.W.2d 457, 462-63 (Tenn. Crim. App. 1996) (affirming the trial court's consideration of the defendant's juvenile record in denying alternative sentencing); State v. Bobby Holt, Jr., No. W2002-02443-CCA-R3-CD, 2003 WL 21957080, at *3 (Tenn.

Crim. App., at Jackson, Aug. 15, 2003), perm. app. denied (Tenn. Dec. 22, 2003) (holding that the trial court properly denied alternative sentencing based in part on the defendant's juvenile history). Accordingly, the record supports the trial court's determination that confinement was necessary to protect society from Appellant Harris, based on his history of criminal conduct.

Second, the trial court found that confinement provided an effective general deterrent to others. T.C.A. § 40-35-103(1)(B). Appellant Harris contests this finding, arguing that the record contains no evidence that confinement will have a deterrent effect.

In Hooper, the Tennessee Supreme Court held that a trial court could rely on deterrence alone to support a denial of probation or an alternative sentence:

> [W]e hold that a trial judge may sentence a defendant to a term of incarceration based solely on a need for deterrence when the record contains evidence which would enable a reasonable person to conclude that (1) deterrence is needed in the community, jurisdiction, or state; and (2) the defendant's incarceration may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

Hooper, 29 S.W.3d at 13. The court recommended that a trial court consider factors, not limited to the following, when determining whether confinement is appropriate because of the need for deterrence:

> (1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole;
>
> (2) Whether the Defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior;
>
> (3) Whether the Defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case;
>
> (4) Whether the Defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective; and
>
> (5) Whether the Defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

-28-

Id. at 10-12.

The trial court here found that the first factor applied. It stated:

[T]hese offenses are increasingly present in this community. This is an aggravated assault. This is a person who facilitated the loss of someone else's life. Memphis[,] Shelby County[,] Tennessee is the second most violent[,] most dangerous metropolitan area in this country. Most of the violence . . . that is in this community . . . is driven by guns, gangs, and drugs. Guns are present in this instance. . . . When you look at the criminal statistics of what's going on in Shelby County, other violent crimes including homicides are going down. Aggravated assault, domestic violence related cases, those cases continue to spiral . . . . [I]nnocent folks are being killed as a result of random gunfire in this community and it has to stop before we have dead bodies all over the streets of Shelby County[,] Tennessee.

In finding that Hooper factor (2) applied, the court determined that Appellant Harris's crime was a result of intentional, knowing, or reckless conduct. In applying Hooper factor (4), the trial court determined that Appellant Harris substantially encouraged or assisted others in achieving the criminal objective. The court found that Hooper factors (3) and (5) did not apply.

Here, we agree with Appellant Harris and conclude that the trial court erred in denying alternative sentencing based on deterrence. Although the trial court described an escalating problem in Shelby County, the record includes no evidence, statistical or otherwise, of the increasing problem under Hooper factor (1). See Hooper, 29 S.W.3d at 11 ("[T]estimony by someone with special knowledge of the level of a particular crime will generally be sufficient to establish the presence of this factor.") Nor do the other two factors alone, on this record, suggest that deterrence is needed in the community and that confinement might rationally serve as a deterrent.

The trial court denied alternative sentencing also based on finding that measures less restrictive than confinement had frequently or recently been applied unsuccessfully to Appellant Harris. T.C.A. § 40-35-103(1)(C). Appellant Harris argues that he has never been placed on probation or given a sentence less restrictive than confinement because all his prior sentences have involved confinement. According to Appellant Harris, the trial court should have granted alternative sentencing as a result. In denying alternative sentencing, the court stated:

At that time [when Harris committed rape of a child on March 25, 1999,] Mr.

Harris would have been about seventeen years old . . . . Juvenile court tried to rehabilitate Mr. Harris, placed him in a structured environment and Mr. Harris, after he was placed in youth services bureau, that did not rehabilitate [him]. Mr. Harris is twenty-eight years old. He does not have an extensive adult record, but he does have crimes, one crime of violence on his record, the assault conviction. He does have theft convictions on his record, which being a convicted thief would indicate that his credibility, his honesty is questioned and he also has a conviction for failure to appear in court, where he's shown that he would not do what a judge will order him to do. So the court does find that measures less restrictive than confinement have been tried and they have been unsuccessful. Confinement has not been successful because he's not been placed on probation as an adult. He has not been sentenced to lengthy criminal sentences. The most lengthy period of incarceration was twelve days, but those attempts to rehabilitate Mr. Harris have in fact failed.

We conclude that the trial court properly denied alternative sentencing based on these findings. The court determined that Appellant Harris had been supervised and counseled through juvenile court programs, which failed to prevent Appellant Harris from committing additional crimes. The court also found that Appellant Harris had a history of disobeying court orders, suggesting that he would be an unsuccessful candidate for alternative sentencing. Id. § 40-35-103(5). The record supports these findings, and the trial court did not err in denying alternative sentencing for these reasons.

Finally, the trial court found that confinement was necessary to avoid depreciating the seriousness of the offenses. Id. § 40-35-103(1)(B). Appellant Harris does not challenge this finding. As the State argues, this finding alone would support the denial of alternative sentencing in this case, where the circumstances of the offenses reflect that Appellant Harris needlessly put many bystanders at serious risk. See State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997) (holding that a court may deny alternative sentencing based on the circumstances of the offense alone when they are "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree" and the nature of the offense "outweigh[s] all factors favoring probation." (quotations and citations omitted)). In short, the record supports the trial court's denial of alternative sentencing, and Appellant Harris is not entitled to relief.

Appellants Mason and Harris argue that the trial court erred in ordering their sentences to be served consecutively. Appellant Mason contends that consecutive sentencing is not necessary to protect society, contrary to the trial court's findings, because her criminal history consists only of one misdemeanor driving offense. Appellant Harris argues that the trial court erred in determining that he was a dangerous offender by punishing him for the level of risk that is implicitly included in his conviction offenses and by mistakenly

attributing to Appellant Harris the additional risk resulting from Appellant Mason's conduct of firing a gun in a residential neighborhood. Appellant Harris also contests the court's findings that consecutive sentences were reasonable in light of the seriousness of the offenses and were necessary to protect the public from Appellant Harris. The State responds that the record supports the trial court's orders of consecutive sentencing. We agree with the State.

When a defendant is convicted of one or more offenses, the trial court generally has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. §40-35-115(a), (b); T.C.A. §40-35-115(d), Sentencing Comm'n Comments ("[W]hile consecutive sentences are discretionary, in a few instances, consecutive sentences are mandated either by statute or by Tenn. R. Crim. P. 32."). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in section 40-35-115(b):

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Id. § 40-35-115(b). Furthermore, an order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense," id. § 40-35-102(1), and the length of a consecutive sentence must be "no greater than that deserved for the offense committed," T.C.A. § 40-35-103(2).

Here, the trial court ordered consecutive sentencing for both Appellant Mason and Harris based on finding that each appellant was "a dangerous offender whose behavior indicat[ed] little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high" under section 40-35-115(b)(4). In the course of the sentencing hearing, the trial court discussed the nature of the offenses and summarized each appellant's involvement in the offenses. It discussed the crime scene, a residential neighborhood, and the danger to bystanders, both in their homes and on the streets where the car chase and shooting occurred. The court determined for each Appellant that the aggregate sentences were necessary to avoid depreciating the seriousness of the offenses and to protect the community.

We conclude that the trial court properly ordered consecutive sentencing based on finding that Appellants Mason and Harris are dangerous offenders under section 40-35-115(b)(4). Regarding this subsection, the Tennessee Supreme Court has stated:

Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.

State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn.1995)). Unlike the other six subsections, the trial court must make additional factual findings for the "dangerous offender" subsection because it is "'the most subjective and hardest to apply.'" Id. (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)).

Considering first Appellant Mason's argument that consecutive sentencing is not necessary to protect society due to her limited criminal history, we conclude that the record supports the trial court's order of consecutive sentencing. Although Appellant Mason had only one relatively minor prior conviction, the egregious nature of the instant offenses, in which Appellant Mason responded to a "bump" to someone else's car by eventually engaging

in a fight, chasing the victims, and then shooting at them multiple times in a densely populated neighborhood, supported the trial court's finding that consecutive sentencing was necessary to protect the public from Appellant Mason. See State v. Tammy R. Flatt, No. M2008-01959-CCA-R3-CD, 2009 WL 4438285, at *21 (Tenn. Crim. App. Dec. 2, 2009) (stating that courts commonly find consecutive sentencing necessary to protect the public when the defendant committed the crime in an "extraordinarily wanton or violent manner"). Appellant Mason is not entitled to relief.

We likewise conclude that the record supports the trial court's order that Appellant Harris serve his sentences consecutively. Appellant Harris correctly asserts that the trial court may not impose consecutive sentencing based on the level of danger that is implicit in the offense of conviction. See State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994). Nevertheless, the record supports the trial court's determination that Appellant Harris committed the offenses here in a manner that created a greater risk to human life than that which is implicit in the offenses of facilitation of criminally negligent homicide and facilitation of aggravated assault. This is so, as the trial court discussed at length, due to the risk to bystanders in close proximity to the chase and shooting, including Teresa Harris, her daughter and granddaughter, and Cassandra Allen-Wolfe. See State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995) (holding that a high risk to human life may be found "in situations where individuals other than the victim are in the area and are subject to injury"), abrogated on other grounds by State v. Charles Justin Osborne, No. 01C01-9806-CC-00246, 1999 WL 298220, at *3 (Tenn. Crim. App. May 12, 1999). Additionally, although Appellant Harris seeks to distinguish his conduct from that of Appellant Mason, the jury's verdict on facilitation established that he knowingly and substantially assisted Appellant Mason in her offenses, while knowing that she intended to commit the offenses. See T.C.A. § 39-11-403 (defining the offense of facilitation). His criminal conduct contributed to the extraordinary high risk of injury to bystanders that made these crimes particularly severe. Finally, the egregious nature of the offense, as determined in Appellant Mason's case, is sufficient to support a finding that consecutive sentences are necessary to protect the public. We therefore conclude that the trial court properly exercised its discretion in ordering Appellant Harris to serve his sentences consecutively.

## CONCLUSION

Upon review, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE